UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

FTS BUSINESS CONSULTANTS, INC.
d/b/a FAST TRACKING SOLUTIONS,

        Plaintiff,

    v.

CULLEN BAKER and THE
AUTHENTIC AGE, LLC,

        Defendants.

26-CV-6251-MAV
DECISION & ORDER

---

On February 27, 2026, Plaintiff FTS Business Consultants, Inc. d/b/a Fast Tracking Solutions ("FTS") filed a complaint against Cullen Baker ("Baker") and The Authentic Age, LLC ("The Authentic Age") alleging violation of the Defend Trade Secrets Act ("DTSA"), breach of contract, and unjust enrichment. ECF Nos. 1–2. On March 9, 2026, FTS filed a Motion seeking a Temporary Restraining Order on Notice ("TRO"), an Expedited Hearing and a Preliminary Injunction (the "TRO Motion"). ECF No. 9. The following day, the Court granted FTS's motion for an expedited hearing and scheduled oral argument. ECF No. 11. In the interim, counsel for The Authentic Age filed a notice of appearance and a motion to dismiss FTS's complaint for lack of jurisdiction and failure to state a claim. ECF No. 17. Baker has not appeared, but has filed through counsel a motion to dismiss for insufficient service. ECF No. 22.

Counsel for FTS and The Authentic Age appeared for oral argument on FTS's motion for a TRO on April 9, 2026. ECF No. 26. Although Baker did not appear,

counsel for The Authentic Age acknowledged that the firm represented Baker, as well. FTS argued that Baker had been properly served the motion papers, and therefore had defaulted on the motion. Counsel for The Authentic Age disputed that characterization, and argued that Baker was under no obligation to appear or respond because he had not yet been properly served.

For the reasons discussed in this Decision and Order, FTS's request for a TRO is granted to the extent detailed below, and the Court defers a decision as to the necessity of a hearing on FTS's request for a preliminary injunction until after the Court resolves Defendants' respective motions to dismiss.

## BACKGROUND

A plaintiff seeking injunctive relief has a "heavier burden" than a plaintiff "bears in pleading the plausible claim necessary to avoid dismissal." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020). Nevertheless, "[t]he Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Mullins v. City of New York*, 626 F.3d 47, 51–52 (2d Cir. 2010) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Accordingly, the following background is drawn from the complaint, the motion papers, and supporting exhibits submitted by FTS.

Based in Rochester, New York, FTS provides professional staffing and recruiting services for clients throughout North America. ECF No. 1 ¶ 8. One of FTS's particular specialties is providing recruiting services to builders in the construction

2

industry, from entry-level roles through the executive level. *Id.* ¶ 11. In working with hundreds of companies in the construction industry, FTS has developed or gathered non-public information that includes the identity and contact information of key persons at construction industry clients; FTS's pricing model and strategy; terms of customer agreements; the needs and preferences of FTS clients; and, the recruiting history of each of its clients. *Id.* ¶ 15. Because recruiting services is an extremely competitive industry, "FTS continually invests substantial resources into developing these resources." *Id.* ¶ 16. FTS maintains that this information constitutes trade secrets as defined in 18 U.S.C. § 1839(3).

Baker worked with FTS from August 2018 through September 2025, beginning as a Database Manager before moving to "People Operations Manager," "Executive Recruiter," "Client Solutions Manager," "Team Lead – Client Solutions," and, ultimately, "Senior Client Solutions Manager." *Id.* ¶ 18. On October 20, 2020, as a condition to promotion, Baker signed a "Non-disclosure and Confidentiality Agreement with Restrictive Covenants" (the "Agreement"). ECF No. 9-3.

There are several provisions from the Agreement that FTS believes relevant to the instant case, including:

> [Section 1(a)] "Confidential information" means all financial, business and other information in whatever form or medium, including, without limitation, any trade secrets, processes, financial data, technical data and documentation, candidate information, strategic planning, product/service specifications, prototypes, computer programs, databases, drawings, models, marketing data and client information, that is furnished or disclosed by FTS or any of its Affiliates, or of any FTS Client or candidate.
>
> * * * *

[Section 1(b)] Confidentiality Obligation/Return of Property. Except as required by law and as otherwise permitted under this Agreement, Employee agrees to keep in confidence and will not use, disclose or otherwise make available any Confidential Information received, directly or indirectly, from FTS or its clients to any person or entity other than its employees, directors, representatives, consultants and Affiliates who have a need to know . . . . Employee shall not remove any FTS confidential information or trade secrets from the FTS premises or from FTS client(s) premises without permission in writing from an officer of FTS.

* * * *

[Section 2(a)(2)] Non-solicitation: During the term of Employee's employment with the Company and for a period of one year from the voluntary or involuntary termination of Employee's employment with the Company for any reason whatsoever, Employee shall not, either on her or his own account or for any person, firm, partnership, corporation, or other entity, directly or indirectly:

a. Clients, candidate and referral sources: solicit, interfere with, obtain business of or from, or endeavor to cause any client, candidate or referral source of the Company known to Claimant to cease doing business or referring to the Company, or cease using the services of the Company; or do business or refer to anyone other than the Company; and

b. Employees: solicit, interfere with, obtain the services of, or endeavor to cause any employee of the Company known to Claimant to leave his or her employment with the Company or to become employed by anyone other than the Company or induce or attempt to induce any such employee to breach her or his employment agreement with the Company.

ECF No. 9-3 at 2–3. In addition, Section 7 of the agreement provides that the "Agreement shall be governed by and construed in accordance with the internal laws of the State of New York," and that "[t]he parties in any action arising out of this Agreement shall be subject to the exclusive jurisdiction and venue of the federal and state courts, as applicable, in the State of New York." *Id.* at 5.

4

After signing the Agreement, Baker had access in his various roles to FTS's employee files, entire portfolio of construction clients, contact information for key individuals, and other confidential information that FTS believes to be trade secrets. ECF No. 1 ¶¶ 19–21. He also worked directly with a majority of FTS's construction client portfolio, becoming "familiar with FTS's critical candidate and referral base that is used to service those clients." *Id.* ¶ 27.

On September 23, 2025, Baker tendered his resignation to FTS, effective September 26, 2025. *Id.* ¶ 30. In so doing, Baker told FTS that he was moving to Florida to pursue other passions. *Id.* ¶ 31. On October 28, 2025, Baker started The Authentic Age, which states on its website that it is a "specialized recruiting partner" with a focus on "construction and real estate industries." *Id* ¶ 34. The website further states that Baker is the "Founder and Principal Recruiter," who moved to Florida "with the excitement of continuing his recruitment journey . . . ." *Id.* ¶ 35.

As alleged, several of FTS's clients have informed it that Baker has contacted them about performing work for them. *Id.* ¶ 48. For instance, on February 9, 2026, FTS received an email from one of its clients in the construction industry stating that it had spoken with Baker about a position it was trying to fill in New Jersey. *Id.* ¶ 47. In his affidavit supporting the TRO motion, FTS Owner and CEO, Thomas Carpitella, stated that the client referenced in the complaint, Fernmoor Living, "is just one of several clients that have informed FTS that Mr. Baker has contacted them about performing work for those clients." ECF No. 9-2 ¶ 42; *see also Mullins*, 626 F.3d at 52 ("[H]earsay evidence may be considered by a district court in determining whether to

grant a preliminary injunction."). Based on this information, FTS believes that Baker and The Authentic Age "are actively soliciting and performing recruiting services for many of FTS's construction industry clients using [FTS's] Confidential Information to their advantage." ECF No. 1 ¶ 50.

FTS therefore seeks a temporary restraining order and a preliminary injunction enjoining Baker from making use of its confidential information.

## LEGAL STANDARD

"'[A] temporary restraining order . . . serves a purpose different from that of a preliminary injunction,' in that '[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.'" *Martin v. Warren*, 482 F. Supp. 3d 51, 67 (W.D.N.Y. 2020) (quoting *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009)). Nevertheless, the criteria for granting a temporary restraining order pursuant to Fed. R. Civ. P. 65(b) ("Rule 65(b)") or a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) ("Rule 65(a)") are the same. *Kramer v. Pawlak*, No. 12-CV-813A(F), 2012 WL 4473256, at *3 (W.D.N.Y. Sept. 26, 2012), *report and recommendation adopted*, No. 12-CV-813A, 2012 WL 5943341 (W.D.N.Y. Nov. 27, 2012). Specifically, a party seeking a TRO or preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions,

that the balance of hardships tips decidedly in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies, which are never awarded as of right, or as a routine matter." *Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 483–84 (W.D.N.Y. 2018) (internal quotation marks and citations omitted). Thus, the Supreme Court has stated they "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139–40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## DISCUSSION

FTS argues that the Court should grant the TRO motion because it has shown imminent irreparable harm in the absence of injunctive relief, in the form of loss of trade secrets, customers, and goodwill that is impossible to quantify; a likelihood of success on its misappropriation of trade secrets, breach of contract, and unjust enrichment claims; and that the issuance of injunctive relief against Baker and the Authentic Age does not outweigh the harm FTS will suffer if injunctive relief is not granted. ECF No. 9-6. In response, The Authentic Age maintains that FTS has failed to demonstrate that the Court has personal jurisdiction, that FTS is likely to succeed on the merits of its breach of contract claim, and that FTS is likely to succeed on its DTSA claim. ECF No. 15.

**I. Service on Baker and the Court's Jurisdiction to Issue a Binding TRO**

As indicated above, there was significant discussion at oral argument regarding the status of service on Baker, and whether or not the Court had jurisdiction to issue a TRO in the absence of proper service of the summons and complaint. To the extent that the argument regarding the impropriety of a TRO is based on a lack of proper service of the summons and complaint, as alleged in Baker's motion to dismiss (ECF No. 22), that argument is unavailing. Rule 65(a) requires only "notice" to the adverse party, and a preliminary injunction or temporary restraining order is binding on any party "who receive[s] actual notice of it by personal service or otherwise." Fed. R. Civ. P. 65(a)(1), (d)(2). Further, Local Rule 65(b) explains that "[t]here are two types of TROs: an *ex parte* TRO and a TRO issued *upon notice to the adverse party*." Loc. R. Civ. P. 65(b) (emphasis added). These rules require only that preliminary injunctive relief be issued upon notice to the adverse party; they do not specify the kind of notice to be given. *See Sec. & Exch. Comm'n v. Cap. Growth Co., S.A. (Costa Rica)*, 391 F. Supp. 593, 600 (S.D.N.Y. 1974).

"The sufficiency of notice is for the trial court's determination under the circumstances of each particular case." *Id.* Without addressing the underlying merits of Baker's motion to dismiss, it cannot be seriously argued here that Baker has not received actual notice of FTS's TRO motion papers. Baker has retained counsel, filed a motion to dismiss in this action, and counsel has appeared for The Authentic Age, a company which lists Baker as its "Manager" with the Florida Division of Corporations. ECF No. 9-4. Additionally, FTS has filed affidavits of service attesting

to service of the TRO motion papers by personal service delivered to the "Admin" of the address listed for The Authentic Age (ECF No. 21) with the Florida Division of Corporations, and by mail to the same address (ECF No. 25). *See, e.g.,* Fed. R. Civ. P. 5(b)(1)(B)(i) (allowing for service of pleadings and other papers by "leaving it . . . at the person's office with a clerk . . ."). Thus, the Court finds that regardless of whether or not Baker has been properly served the summons and complaint, he has had actual notice of the TRO motion papers and proceedings sufficient to be bound by the Court's order. *See, e.g., Hurlock v. Kelsier Ventures,* No. 1:25-CV-03891 (JLR), 2025 WL 1917939, at *2 (S.D.N.Y. June 27, 2025) (finding notice by email "plainly sufficient," and collecting cases finding notice of a TRO or TRO proceedings was sufficient even though defendants were not yet properly served with the summons and complaint).

Baker's arguments in his motion to dismiss regarding service of summons and personal jurisdiction can be addressed in the parties' briefing and, if required, by additional oral argument or a preliminary injunction hearing.

## II. The Court's Personal Jurisdiction over The Authentic Age

The Authentic Age maintains that although FTS has adequately alleged federal subject matter jurisdiction under the DTSA, it has not pled sufficient facts to demonstrate the Court has personal jurisdiction because it has not shown that The Authentic Age "engaged in forum-directed conduct sufficient under New York's long-arm statute and due process." ECF No. 15 at 3. In reply, FTS maintains that the Court possesses personal jurisdiction over The Authentic Age, Baker's company, by virtue of the forum selection clause in the Agreement signed by Baker. Based on the

information before the Court at this stage, the Court agrees with FTS that it has personal jurisdiction over The Authentic Age.

## A. Legal Principles

"'In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process.'" *Minden Pictures, Inc. v. Grupo Televisa, S.A.B.*, 738 F. Supp. 3d 458, 463–64 (S.D.N.Y. 2024) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). However, it is well-settled in the Second Circuit that "[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 152 (E.D.N.Y. 2012) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006)). Thus, if a court finds that an agreement's forum selection clause is both valid and applicable, "it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process." *LaRoss Partners, LLC*, 874 F. Supp. 2d at 153 (citation and internal quotation marks omitted).

As relevant here, "the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009). Indeed, courts in this Circuit have held that forum selection clauses may bind non-signatories to the agreement where the non-signatory is "closely related" to the signatory. *NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 350–51 (S.D.N.Y. 2020) (collecting

cases). The key inquiry in this "closely related" analysis is whether "enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." *NuMSP, LLC*, 462 F. Supp. 3d at 350 (citation and internal quotation marks omitted). Additionally, "[a] non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct." *Overseas Ventures, LLC v. ROW Mgmt., Ltd., Inc.*, No. 12 CIV. 1033 PAE, 2012 WL 5363782, at *5 (S.D.N.Y. Oct. 26, 2012) (collecting cases and citing, *inter alia, Lipcom v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998)); *Aguas Lenders Recovery Grps.*, 585 F.3d at 701).

## B. Application

As indicated above, FTS maintains that the Court has personal jurisdiction over The Authentic Age, Baker's company, by virtue of the forum selection clause in the Agreement signed by Baker. In its reply brief, FTS observed that "[w]hile the Second Circuit has not reached the question of when a signatory may enforce a forum selection clause against a non-signatory, a number of district court cases in this Circuit have embraced the 'closely related' standard in cases analogous to this one." ECF No. 16 at 2 (quoting *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 324 (S.D.N.Y. 2017)). FTS asserts that The Authentic Age is closely related to Baker because he founded The Authentic Age "only one month after [he] resigned from FTS . . . specifically to compete with FTS using the trade secrets he obtained during his employment with FTS." ECF No. 16 at 3.

11

When given the opportunity to respond to FTS's position at oral argument, The Authentic Age maintained that it could not be held to the forum selection clause of the Agreement because FTS had failed to demonstrate that it was "closely related" to Baker. The Authentic Age pointed out that it was not even in existence at the time Baker signed the Agreement, and that it was a "separate juridical person."

For the purposes of the TRO motion, the Court finds that FTS has adequately shown that The Authentic Age is closely related to Baker. FTS alleges that The Authentic Age was formed approximately one month after Baker resigned from FTS, and that Baker is the managing member. ECF No. 1 ¶¶ 30, 33. FTS supports this allegation with registration paperwork from the Florida Division of Corporations. ECF No. 9-4. Additionally, FTS alleges that Baker holds himself out as the Founder and Principal Recruiter for The Authentic Age, and supports this allegation with screenshots from The Authentic Age website. ECF No. 9-5. At this stage, that is sufficient to demonstrate The Authentic Age's interests are "completely derivative of" and "directly related to, if not predicated upon" the signatory party's interests or conduct. *See, e.g., Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 328–29 (S.D.N.Y. 2008) (discussing *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 209–10 (7th Cir. 1993), which found a forum selection clause enforceable against two non-signatory companies that were owned by the individual signatory).

That is, FTS has made a sufficient preliminary showing that The Authentic Age's ability to recruit in and for the construction industry and potentially solicit FTS's clients is derivative of and predicated on whether Baker misappropriated FTS's

trade secrets or other confidential information, or is in compliance with his obligations under the Agreement. *See, e.g., Int'l Priv. Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 486 (W.D.N.Y. 1997) (finding it was potentially foreseeable to the non-signatory that by purchasing customer lists and assets from the signatory, and performing the same services as the signatory, it might be closely enough related to be bound under the forum selection clause in the signatory's contracts.). Thus, at this stage, the Court is satisfied that it has personal jurisdiction over The Authentic Age.

## III. Irreparable Harm

Since "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[,] . . . the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). Thus, plaintiffs seeking preliminary injunctive relief must affirmatively "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). To be clear, the plaintiff is not required to demonstrate that it has already suffered actual harm as a result of defendant's conduct prior to grant of the injunctive relief. *Mullins*, 626 F.3d at 55. Rather, "[t]he standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Id.*

13

Irreparable harm is "harm to the plaintiff's legal interests that could not be remedied after a final adjudication." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). "[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 240 (E.D.N.Y. 2024) (citing *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010)). Indeed, the Second Circuit has acknowledged that "it would be very difficult to calculate damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). Additionally, "[c]ourts routinely have noted that it is very difficult to calculate the monetary damages that would successfully redress the loss associated with trade secret misappropriation." *Int'l Bus. Machs. Corp. v. Papermaster*, No. 08-cv-9078, 2008 WL 4974508, at * 7 (S.D.N.Y. Nov. 21, 2008) (collecting cases)).

"[I]t has consistently been held that the loss resulting from a party's breach of a restrictive covenant is not easily quantifiable by money damages and is, therefore, protectable by a preliminary injunction." *Devos, Ltd. v. Record*, No. 15-CV-6916, 2015 WL 9593616, at *8 (E.D.N.Y. Dec. 25, 2015). However, relief is not automatic where a plaintiff alleges irreparable harm from breach of a restrictive covenant in employment contracts: the Second Circuit has held that courts must examine the factual particulars of the case. *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (quoting *Baker's Aid v. Hussmann Foodserv. Co.*, 830 F.2d 13, 15 (2d Cir. 1987)). In that regard, although language in the contested

14

agreement specifying that breach of the restrictive covenant is not dispositive, "courts may view [such terms] as evidence of an admission that irreparable harm has occurred." *Hercules Pharms., Inc. v. Cherne*, No. 24-CV-5659 (JS)(AYS), 2024 WL 4406899, at *2 (E.D.N.Y. Sept. 18, 2024), *aff'd*, No. 24-2545-CV, 2025 WL 1099431 (2d Cir. Apr. 14, 2025) (quoting *Roswell Cap. Partners LLC v. Alt. Const. Tech.*, No. 08-CV-10647, 2009 WL 222348, at *17 (S.D.N.Y. Jan. 30, 2009), and collecting other cases).

Initially, the Court notes that Section 3 of the Agreement, entitled "Remedies," provides that:

> Without limiting the remedies available to the Company, the Employee acknowledges that a breach of any of the covenants contained in Sections 1 and 2 herein could result in irreparable injury to the Company for which there might be no adequate remedy at law, and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary injunction and a permanent injunction restraining the Employee from engaging in any activities prohibited by Sections 1 and 2 herein or such other equitable relief as may be required to enforce specifically any of the covenants of Sections 1 and 2 herein. The foregoing provisions of Sections 1 and 2 herein shall survive the termination of this Agreement and shall continue thereafter in full force and effect in accordance with the terms of Sections 1 and 2 herein for the periods of time contemplated thereby.

ECF No. 9-3 at 3. Without viewing this provision as dispositive, the Court does nevertheless consider it as evidence in favor of the view that Baker and FTS agreed that a breach of the restrictive covenants in the Agreement was likely to cause irreparable harm. *See Hercules Pharms., Inc.*, 2024 WL 4406899, at *2.

As further evidence that failure to enjoin Baker and The Authentic Age is likely to cause irreparable harm, FTS presents evidence indicating that Baker has already

15

spoken with a number of FTS's clients. As noted above, FTS CEO Carpitella has affirmed under oath that a decision-maker at one of his clients, Fernmoor Living,[1] emailed an FTS employee and stated that she had "spoken to [Baker] about a position I'm trying to fill in Absecon, NJ." ECF No. 92 ¶ 41. Carpitella also affirmed that "Fernmoor Living is just one of several clients that informed FTS that Mr. Baker has contacted them about performing work for those clients." *Id.* ¶ 42. The Court is not persuaded by The Authentic Age's contention at oral argument that Carpitella's statements require impermissible inferences to reach the conclusion that Baker was soliciting Fernmoor Living. Carpitella's statements at ¶¶ 41 and 42 of his affidavit, taken together, create the strong inference that FTS has been informed by its clients that they are being solicited by Baker. *See also* ECF 9-7 (identifying FTS employees who are prepared to testify at a preliminary injunction hearing regarding information they have received from FTS clients that Baker is contacting them).

Based on this evidence, the Court finds that FTS has sufficiently shown the threat of irreparable harm in the absence of injunctive relief. *See, e.g. Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885, 887 (2d Cir. 2008) (affirming the district court's conclusion that the defendant's solicitation of the plaintiff's clients would likely harm the plaintiff's good will).

## IV. Likelihood of Success on the Merits

At the outset, the Court notes that the likelihood of success standard in the

---

[1] Though Carpitella does not identify the decision-maker by name in his affidavit, FTS's exhibit list, submitted pursuant to Fed. R. Civ. P. 65, indicates the email was from the "Director of Sales/Leasing and Marketing of Fernmoor Living." ECF No. 9-7 at 3.

Second Circuit has required the party seeking injunctive relief to show "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). Further, courts have found that the plaintiffs need not satisfy the standard for *all* of their claims for relief, but only on *at least one* of their claims. *Hercules Pharms., Inc.*, 2024 WL 4406899 at *3 (citing *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022)). Because the Court need only analyze a single claim, the Court examines FTS's claim for breach of contract, and finds that FTS has demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward FTS.

It is well-settled that to adequately state a claim for breach of contract under New York law, a plaintiff must allege: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quotation omitted). Here, The Authentic Age maintains that FTS cannot show the third element of the claim because the restrictive covenant that Baker and the Authentic Age are alleged to have breached is unenforceable due to being overbroad and unsupported by a sufficient showing of protectable interest or actual misuse, and "facially defective and materially

ambiguous." ECF No. 15 at 8–13. In its reply papers and at oral argument, FTS made clear that it was not seeking to enforce the non-compete provision in Section 2 of the Agreement. Accordingly, the Court will limits its analysis of the Authentic Age's arguments to the "confidentiality and non-disclosure" and "non-solicitation" provisions.

## A. Legal Principles

"Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law." *Kamfar v. New World Rest. Group, Inc.*, 347 F. Supp. 2d 38, 48–49 (S.D.N.Y. 2004).

The matter of whether the contract is ambiguous is also a question of law for the court. *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (citations and internal quotation marks omitted).

With respect to employment agreements involving restrictive covenants, it is well-settled under New York law that "[b]ecause enforcement of employee restrictive covenants may result in the loss of an individual's livelihood, such covenants are

18

rigorously examined and enforced only to protect an employer from unfair competition stemming from—among other things—the disclosure of trade secrets." *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999) (citations and internal quotation marks omitted). Restrictive covenants, are subject to specific enforcement only to the extent that they are "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Denson v. Donald J. Trump for President, Inc.*, 530 F. Supp. 3d 412, 432 (S.D.N.Y. 2021) (citations and internal quotation marks omitted).

## B. Application

The Court is not persuaded by The Authentic Age's argument that the provisions at issue in the Agreement are unenforceable. ECF No. 15 at 8–13.

In terms of duration, although the non-disclosure of confidential information provision does not have a durational limitation, under New York law, there is "'no reason to suppose that [an unlimited durational] limitation [on the use of confidential information] will prevent defendant[s] from pursuing [their] livelihood or that it will have the effect of precluding [them] from operating a successful [competing business].'" *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 105 (2008), *aff'd as modified*, 925 N.E. 2d 581 (N.Y. 2010) (quoting *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 202 (N.Y. 1996)). In addition, the non-solicit provision is limited to "a period of one year from the voluntary or involuntary termination of Employee's employment with the Company . . . ." ECF No. 9-3 at 3.

19

"New York courts have effected such covenants for a one-year period." *Kelly v. Evolution Markets, Inc.*, 626 F. Supp. 2d 364, 373–74 (S.D.N.Y. 2009) (citations omitted); *see also Hercules*, 2024 WL 4406899 at * 5 (collecting cases, including cases with restrictive covenants of longer duration). The non-solicit provision's nationwide scope – though broad – is also not unreasonable because it is consistent with the protection of FTS's alleged nationwide client-base. *Kelly*, 626 F. Supp. 2d at 374; see also ECF No. 9-2 ¶¶ 5–7 (stating FTS's construction practice is one of only two national practices).

Further, FTS has made a showing of a protectable interest rather than "a readily ascertainable market participant or ordinary commercial lead." ECF No. 15 at 10. For instance, Carpitella's affidavit states that while employed by FTS, Baker "became intimately familiar with the identity and contact information of the key people of those clients in the construction industry . . . the needs and preferences of those clients, and the recruiting history of those clients." ECF No. 9-2 ¶ 21. Even if the company names and general contact information of construction companies across the country are "readily ascertainable," the key contact information and recruiting history are not.

Moreover, the Court does not agree with The Authentic Age's argument that the relevant provisions in the Agreement were defective and materially ambiguous. Although The Authentic Age points out that the definition of "Market Area" in the confidentiality and non-disclosure provision is inconsistent with the usage of that term in another section of the Agreement, it does not identify any relevant impact

20

this may have on the application of that provision: it alleges no ambiguity in the definition of "Confidential Information" or in that portion of the provision which defines Baker's "Confidentiality" and "Return of Property" obligations. ECF No. 15 at 11. Indeed, the term "Market Area" is not used in either of those definitions, and does not create ambiguity. *See* ECF No. 9-3 at 2. Neither is the term used in the non-solicit provision.

The Court also disagrees with The Authentic Age's argument that the non-solicitation provision is ambiguous because it involves a prohibition on the solicitation of clients, candidates, referral sources, or employees "known to Claimant." ECF No. 9-3 at 3. While the Court agrees with The Authentic Age that a court may not "make a new contract for the parties under the guise of interpreting the writing" (ECF No. 15 at 12, citing *Vermont Teddy Bear Co. v. 538 Madison Realty Co.,* 1 N.Y.3d 470, 475), the Court also recognizes that New York law permits scrivener's errors to be equitably reformed to honor the original intentions of the contracting parties. *Born v. Schrenkeisen*, 17 N.E. 339, 341 (1888).

Without making a binding ruling on this particular issue, the Court notes that The Authentic Age's claim that "Claimant" in the non-solicit provision creates ambiguity as to whether the "Claimant" is FTS or Baker, does not seem to hold up when its use is viewed in context. For instance, the relevant text of the non-solicitation clause regarding clients, candidates and referral sources prohibits Baker from soliciting "any client, candidate or referral source of the Company known to Claimant to cease doing business or referring to the Company, or cease using the

21

services of the Company." ECF No. 9-3 at 3. It does not strike the Court that this provision would suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement, particularly when the term "Claimant" is used only twice in the non-solicit provision and not again throughout the Agreement, and the Agreement consistently refers to FTS as "the Company" and to Baker without a preceding article, "the," but simply as "Employee." It strikes the Court, upon preliminary review, as a scrivener's error involving the failure to replace "Claimant" with "Employee."

The Court has also considered The Authentic Age's arguments as to the ambiguity created by the syntax of the non-solicitation provision, and FTS's paraphrasing of the Agreement in its papers as "underscoring" the agreement's defects, but finds them similarly unpersuasive.

At this juncture and on the limited record before it, the Court finds that FTS has, at the very least, shown serious questions on the merits sufficient to satisfy this prong of their TRO Motion.

## V. Balance of Hardships

The Court acknowledges The Authentic Age's proffered hardship, i.e., that compliance with the non-solicit provision may affect its ability to find clients for its recruiting business focused on the construction industry. The Court finds this factor does not favor The Authentic Age since, in granting FTS's TRO Motion, "the Court would be enforcing contractual obligations to which" FTS has made a preliminary showing that Baker "freely agreed, and in exchange for which [he] received the

22

benefits of [his] employment with [FTS]." *Intertek Testing Servs, N.A., Inc.*, 443 F. Supp. 3d at 346. In fact, the balance of hardships weighs decidedly in FTS's favor because the injunctive relief sought merely bars Baker and the Authentic Age from soliciting FTS's clients, an obligation which FTS has made a preliminary showing that Baker is already under. *See Hercules*, 2024 WL 4406899 at *6 (collecting cases).

## VI. Public Interest Considerations

Finally, the Court finds the public interest would not be disserved by the issuance of a TRO in this case. *See U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest."). The public interest here is served by the enforcement of what FTS has made a preliminary showing to be the parties' lawful agreement. *Hercules Pharms., Inc. v. Cherne*, No. 24-2545-CV, 2025 WL 1099431, at *1–2 (2d Cir. Apr. 14, 2025) (citing *Benihana, Inc.*, 784 F.3d at 897).

In sum, FTS has demonstrated a likelihood of irreparable injury in the absence of an injunction, sufficiently serious questions going to the merits to make them fair ground for litigation and that the balance of hardships tips decidedly in its favor, and that the public interest would not be disserved by the issuance of a TRO. Therefore, FTS is entitled to a TRO.

## VII. Security

Because the Court has found that FTS is entitled to a TRO, the Court must consider whether — and in what amount — it should order FTS to provide a security. Pursuant to Federal Rule of Civil Procedure 65(c), a "court may issue a preliminary

23

injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Rule 65(c)'s security requirement is designed to "assure[ ] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011). Courts have broad discretion to set the amount of a bond or to dispense with it all together. *Can't Live Without It, LLC v. ETS Express, Inc.*, No. 17-CV-3506 (JSR), 2017 WL 4776741, at *2 (S.D.N.Y. Oct. 10, 2017); *see also State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 86 (2d Cir. 2024) ("Courts have the discretion . . . to require no security at all depending on the specific circumstances.").

FTS asks the court to exercise its discretion to dispense with the filing of a bond in this case, on the grounds that there is no likelihood of harm to Baker or The Authentic Age because the requested injunction will do nothing more than prohibit Baker and his company from transgressing the contract that Baker signed with FTS in 2020. ECF No. 9-6 at 16–17. The Authentic Age, on the other hand, argues that the Court should require FTS to post a "meaningful bond" because "any injunction against The Authentic Age would directly impair its ability to operate its business, communicate with prospective clients, and compete in the marketplace while this action proceeds." ECF No. 15 at 22.

With respect to the issuance of a bond in this case, it bears repeating that the

24

primary purpose of a bond is to make the enjoined party whole in the event that it is later determined that the injunction was wrongfully issued. *See* Fed. R. Civ. P. 65(c). Although there would certainly be potential clients that Baker and The Authentic Age would be prohibited from contacting, all that the TRO does is require Baker and his company to abide by the terms of the non-disclosure and non-solicitation provisions of the Agreement Baker signed in 2020, the latter of which is in force until no later than September 26, 2026. "[B]eing forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of 'damage' that is compensable at law." *Rex Med. L.P.*, 754 F. Supp. 2d at 627. The Court acknowledges The Authentic Age's argument that it was not a party to that contract (ECF No. 15 at 22), but as discussed above the circumstances alleged in this case strongly suggest that Baker and The Authentic Age are closely related, and The Authentic Age's arguments do not identify any specific costs or damages that the TRO would cause. Accordingly, FTS is not required to post bond at this time.

## TEMPORARY RESTRAINING ORDER

For the foregoing reasons, it is hereby:

ORDERED, that until further Order of this Court, Baker and The Authentic Age are prohibited from using FTS's Confidential Information, as defined in "Section 1" of the Agreement (ECF No. 9-3 at 2); and it is further

ORDERED, that until the earlier of either a further Order of this Court or September 26, 2026, Baker and The Authentic Age are enjoined and restrained from directly or indirectly (i) soliciting, encouraging or inducing any client of FTS to

25

terminate or diminish its relationship with FTS, or (ii) persuading or inducing any such client, candidate, or referral source of FTS to conduct with anyone else any business or activity which such client, candidate, or referral source conducts or could conduct with FTS; and it is further

ORDERED, that until the earlier of either a further Order of this Court or September 26, 2026, Baker and The Authentic Age are enjoined and restrained from directly or indirectly hiring or soliciting for hire, any employee of FTS or seeking to persuade or induce any employee of FTS to discontinue employment with FTS.

The Court is cognizant that "[t]he purpose of a TRO is to preserve the status quo until a preliminary injunction hearing can be held." *Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 63 (E.D.N.Y. 2023). At this stage, however, given that Baker's and The Authentic Age's respective motions to dismiss are still in the briefing stages, the Court finds that scheduling a preliminary injunction hearing would be premature.

SO ORDERED.

Dated:    April 21, 2026
          Rochester, New York

                                   HON. MEREDITH A. VACCA
                                   United States District Judge

26